UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOSE A. GONZALEZ, II, § <br> TDCJ No. 2016068, § <br> § <br> Petitioner, § <br> § <br> v. § <br> § <br> LORIE DAVIS, Director, § <br> Texas Department of Criminal Justice, § <br> Correctional Institutions Division, § <br> § <br> Respondent. § | | CIVIL NO. SA-17-CA-853-FB |

**MEMORANDUM OPINION AND ORDER**

Jose Gonzalez, an inmate in the custody of the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ–CID"), has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder. As required by Rule 4 of the Rules Governing Section 2254 Cases, the Court conducted a preliminary review of the petition. Having considered the habeas application (ECF No. 1), the respondent's Answer (ECF No. 6), Mr. Gonzalez's supplemental pleading (ECF No. 10), the record (ECF No. 7), and applicable law, the Court finds the petition should be **DENIED**.

**I. Procedural Background**

A grand jury indictment returned October 21, 2014, charged Jose Gonzalez with one count of murder and alleged he was a habitual offender. (ECF No. 7-3 at 6). A jury found Mr. Gonzalez guilty, found the enhancements true, and assessed punishment at a term of 30 years' imprisonment. (ECF No. 7-3 at 114).

Mr. Gonzalez appealed his conviction and sentence, asserting the evidence was legally insufficient to support the jury's verdict; the trial court erred by admitting a witness's testimony; and he was denied the effective assistance of counsel. (ECF No. 7-20). The Fourth Court of Appeals affirmed the judgment of the trial court. *Gonzalez v. State*, No. 04-15-00558-CR, 2016 WL 3944830 (Tex. App.–San Antonio 2016, pet. ref'd). The Texas Court of Criminal Appeals refused Mr. Gonzalez's petition for discretionary review. *Id.* Mr. Gonzalez did not seek a state writ of habeas corpus.

In this section 2254 action, petitioner Gonzalez alleges: (1) the evidence was insufficient to sustain his conviction; (2) his trial attorney was ineffective in failing to preclude evidence of a prior bad act; (3) counsel was ineffective for failing to object to improper jury argument; and (4) counsel was ineffective in failing to introduce evidence of self-defense. (ECF No. 1). Respondent argues all of the petitioner's claims must be denied. (ECF No. 6).

## II. **Factual Background**

The Fourth Court of Appeals of Texas summarized the facts presented at trial as follows:

> In 2014, Rachel Gonzalez and Ahn Cisneros were in a relationship and living together, along with Rachel's children. . . .
>
> In May 2014, Gonzalez asked Rachel, his cousin, for a place to live. Ahn offered his house to Gonzalez . . . Soon thereafter, Gonzalez and his girlfriend Trudy Ramos moved into Ahn's house. In June 2014, Rachel and Ahn argued, and Ahn moved back to his own house. Shortly thereafter, Gonzalez and Trudy left Ahn's house and moved in with Rachel.
>
> ∗∗∗
>
> Rachel denied ever telling Gonzalez she felt threatened by Ahn or needed Gonzalez's protection, or that her children were in danger and needed protection from Ahn. However, Rachel admitted Ahn had once kicked her on her shin during an argument. She also admitted she had complained to Gonzalez about Ahn . . .
>
> . . . On the morning of June 30, 2014, Ahn went to Rachel's house to see her before she left for work. When Rachel left for work, Ahn also left because Rachel "was afraid [Gonzalez] would get upset or something because [she did not] think

[Gonzalez] wanted" her and Ahn to be together . . . When Rachel and Ahn left the house, Gonzalez, Trudy, and Rachel's children were all still asleep in the house.

At some point later that day, Rachel's daughter called her to say that Ahn had returned to the house and Trudy was upset. Shortly after 5:00 p.m., as Rachel was driving home from work, she spoke on her cell phone to Ahn, who was in Rachel's bedroom. Rachel said Ahn locked her bedroom door as they spoke. According to Rachel, she told Ahn she was not comfortable with him being at her house without her because of the tension, and Ahn said he would apologize to Gonzalez. Rachel stated that while she was on the phone with Ahn, she did not hear any argument or confrontation. However, as they spoke, Rachel heard Ahn make a "weird noise" and yell, and then she heard gunshots. Rachel said she heard nothing more from Ahn, but she heard her son yelling "why did you do that?" She also heard Gonzalez calling for Trudy.

About one block from her house, Rachel stopped when she saw a police car, and she told the police officer that he needed to go to her house because Ahn was not responding to her and she thought something "really bad just happened." She told the officer she thought Gonzalez had shot Ahn.

While Rachel was still holding her telephone, she heard her son say "here it is" and then the phone disconnected. Before Rachel reached her house, she received a text message from Trudy telling her not to come home. Gonzalez also called Rachel but would not tell her what happened, and instead, asked her if she was alone and told her to call Trudy. . . . By the time Rachel arrived home, police officers were waiting outside her house. When she unlocked the backdoor, the smell of bleach was apparent and there was blood on the washer and dryer. Rachel said Trudy was standing in the laundry room crying.

[A] neighbor, who lived across the street from Rachel, said another neighbor called her to say she thought she heard four gunshots. When [the neighbor] looked out her window towards Rachel's house, she saw Gonzalez and Trudy carry a body outside and put the body into the trunk of Ahn's car . . . She told her boyfriend to call 911.

Trudy testified that, sometime in 2014, she purchased the gun used to shoot Ahn. She said she later "lost track" of the gun after an argument with Gonzalez. . . . Trudy said the gun had been in Gonzalez's truck and he had access to the gun. Trudy testified Rachel told her she did not want Ahn to be at her house when Rachel was not also there. On the day of the shooting, Trudy and Gonzalez went to visit Gonzalez's brother. According to Trudy, his brother wanted her and Gonzalez to move in with him and his family. She said she and Gonzalez planned to "just pack up [their] stuff and leave" Rachel's house because she and Gonzalez did not "want any involvement with Rachel and Ahn's relationship." She denied complaining to Gonzalez about how Ahn treated her, Rachel, or Rachel's children.

While at Gonzalez's brother's house, Trudy had to return to Rachel's house on an errand. She said Gonzalez, whom she described as "somewhat" controlling, was angry because she intended to leave without him. When Trudy arrived at Rachel's house at about 4:00 or 4:30 p.m., Ahn was inside the house in the living room with Rachel's two children. Trudy texted Gonzalez to tell him that Ahn and Rachel's children were at the house, but she said she did not tell Gonzalez there were any problems or need for him to come to the house. Nevertheless, Gonzalez responded that he was on his way to Rachel's house so that they could pack their belongings and leave.

Trudy said that when Gonzalez arrived at Rachel's house, she was sitting outside on the front porch with Rachel's daughter, while Ahn was inside the house with Rachel's son. She said Gonzalez did not say anything to her, but instead, walked directly into Rachel's house through the back entrance. After Gonzalez entered the house, Trudy heard no arguments or indication of a fight. Instead, she heard four gunshots. After hearing the shots, Trudy went into the house, saw blood on the floor and Gonzalez coming out of the laundry room looking panicked, scared, and angry. She said Gonzalez scared her because he "was just talking really aggressive towards" her and telling her to help him move Ahn's body and clean up the blood. She said Gonzalez handed her the gun and told her to "get rid of it." She hid the gun under the mattress in the bedroom she and Gonzalez shared. She said she helped Gonzalez because she was afraid of him. Trudy later testified that Gonzalez assaulted her, "busted [her] head open" and choked her the night he stole the gun from her. However, she admitted she stayed in the relationship with Gonzalez after this alleged assault.

Rachel's son, Ruben, testified that a few days before the shooting,

[Gonzalez] said, Do you care if anything happened to Ahn? And I said, I don't know, why? And he said because he [Gonzalez]—he's going to kill [Ahn], that he was going to put a bullet in his head, like one right here (indicating). And he said he's gonna—he's gonna cut the mattress open and use that as a body bag and he's going to take it to his brother's and he's going to chop him up and send—like take him far away. . . . [H]e was just gonna make it seem [like] Ahn went missing.

Ruben said he asked Gonzalez, on the day before the shooting, whether he was still "going to do it," and Gonzalez said "no." According to Ruben, Gonzalez wanted to kill Ahn because Gonzalez did not like the way Ahn treated Rachel.

Ruben testified that, on the afternoon of the shooting, Gonzalez entered through the back of the house with a gun in his hand. Ruben said he stood up and said to Gonzalez, "what are you doing? Stop." Gonzalez ignored Ruben and walked past him to try to open the door to Rachel's bedroom. When Gonzalez could not open the door, he kicked it open, told Ahn to "Get the F out," and then shot Ahn twice. Ruben described Gonzalez as "mad." After hearing two shots, Ruben heard Ahn

reply "Okay, okay," but it sounded like Ahn had blood in his mouth. At this point, Ruben ran to the front of the house, and told his sister and Trudy that Gonzalez shot Ahn. By the time Ruben went back into the house, he heard two more shots. As Ruben entered the living room, he saw Ahn on the floor in the laundry room.

Rachel's daughter, Cassandra, also testified. She said that when Gonzalez arrived at their house the afternoon of the shooting, she thought he was mad because he drove into the driveway "fast." She did not see him enter the house through the back door, but she heard gunshots and Ahn yell. When she walked into the house, she saw blood on the floor of the living room and kitchen. She then saw Gonzalez hand the gun to Trudy. She said Gonzalez did not like the way Ahn treated her mother. Cassandra stated that, on the night before the shooting, while Ahn and Rachel were at the movies, Gonzalez told her that he "just didn't want to live under the same roof as" Ahn and that Gonzalez "wanted to get rid of him."

When the police arrived at Rachel's house, Ahn's car was not there, although the police found blood on Rachel's driveway. The police were also unable to locate Gonzalez. The officers handcuffed Trudy and placed her in a patrol car. Meanwhile, Rachel's children "came out crying that [Gonzalez] had shot Ahn."

\*\*\*

San Antonio Police Detective Ben Flores testified that on the night of the incident he received a dispatch call to be on the lookout for a gray Dodge Dart and he was told the owner of the car might be deceased and inside the trunk. Detective Flores was told to look for the car on Fernview, the street on which Gonzalez's brother lived. When Detective Flores saw the car parked about two streets away from Fernview, he called other detectives and waited for their arrival. When Homicide Detectives Duke and Ramirez arrived, one of them opened the car's trunk to discover Ahn "faced down, shirtless, almost in a fetal position."

San Antonio Homicide Detective Mark Duke testified that, during his examination of the inside of Rachel's house, he saw multiple shell casings and bullet holes throughout the house and he believed the shooting occurred in multiple rooms. . . . Detective Duke said Gonzalez was apprehended in Houston, Texas about one month after the shooting and extradited back to San Antonio, at which time Duke interviewed him. During the interview, Gonzalez did not deny shooting Ahn . . .

*Gonzalez v. State*, No. 04-15-00558-CR, 2016 WL 3944830, at \*1-4 (Tex. App.–San Antonio 2016, pet. ref'd).

## III. Standard of Review

**A. Review of State Court Adjudications**

Mr. Gonzalez's habeas petition is governed by the heightened standard of review provided by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. Under section 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This intentionally difficult standard stops just short of imposing a complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion. *Richter*, 562 U.S. at 102. Instead, a petitioner must show the state court's decision was objectively unreasonable, a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). As long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief.

*Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

### B. Review of Sixth Amendment Claims

The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of trial counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a petitioner must demonstrate counsel's performance was deficient and this deficiency prejudiced his defense. *Id.* at 687-88, 690. The Supreme Court has held that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland*, 466 U.S. at 687-89. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 690). Accordingly, there is a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A *Strickland* claim fails if the petitioner cannot establish either deficient performance or prejudice and, accordingly, the Court need not evaluate both prongs of the test if the petitioner makes an insufficient showing as to either performance or prejudice. *Strickland*, 466 U.S. at 697; *Blanton v. Quarterman*, 543 F.3d 230, 235-36 (5th Cir. 2008). A habeas petitioner has the burden to prove both prongs of the *Strickland* test. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009); *Blanton*, 543 F.3d at 235.

## IV. ANALYSIS

### A. Insufficiency of the evidence

Petitioner Gonzalez argues there was insufficient evidence of his intent to find him guilty of murder and to find he did not shoot Mr. Cisneros in self-defense. (ECF No. 1 at 5). Mr. Gonzalez raised this claim in his appeal, and the appellate court found and concluded:

> A jury verdict of guilty is an implicit finding rejecting a defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). . . . Defensive evidence that is merely consistent with the physical evidence at the scene of the alleged offense does not render the State's evidence insufficient because the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. *Saxon*, 804 S.W.2d at 914.
>
> ***
>
> In this case, the jury was free to reject some or all of Gonzalez's version of the events leading to the fatal shooting. Even if the jury did not believe Ruben's testimony that Gonzalez entered the house holding a gun, Gonzalez himself admitted he retrieved the gun from his room, loaded a clip, chambered a round, and did not engage the safety—all before making any contact with Ahn who was inside Rachel's room with the door closed. Although Gonzalez testified he first shot Ahn because Ahn lunged at him from the bed, the jury heard the medical examiner's testimony that the trajectory of the first bullet was downward. The jury also heard testimony that Gonzalez continued to shoot Ahn after Ahn left the bedroom, including shooting him in the back at least three times.
>
> The only evidence offered to raise the issue of self-defense was Gonzalez's own testimony that he shot Ahn because Ahn lunged at him in the bedroom and he thought Ahn grabbed something in the kitchen. In our review, we defer to the jury's assessment of the credibility of the witnesses, and the jury in this case could have

disbelieved Gonzalez's testimony. Furthermore, the jury was entitled to consider Gonzalez's actions in placing Ahn's body into the trunk of a car, fleeing the scene after the shooting, telling his brother's family to leave their house because he knew the police would be looking for him, and his flight to Houston. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (stating "factfinder may draw an inference of guilt from the circumstance of flight"); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (acknowledging flight from scene as evidence jury could consider in rejecting self-defense claim).

Having reviewed all of the evidence in the light most favorable to the prosecution, we conclude the jury rationally could have found each element of the charged offense was proven beyond a reasonable doubt, and also rationally could have rejected Gonzalez's self-defense claim.

*Gonzalez v State,* No. 04-15-00558-CR, 2016 WL 3944830, at *7-8 (Tex. App.–San Antonio 2016, pet. ref'd).

The controlling federal law is stated in *Jackson v. Virginia*, 443 U.S. 307, 325-26 (1979). To be entitled to relief on a sufficiency of the evidence claim, a petitioner must prove that no rational trier of fact could have found the existence of facts necessary to establish guilt beyond a reasonable doubt. When applying this standard, all evidence is viewed in the light most favorable to the prosecution, *Id.* at 319, and all credibility choices and conflicts in the evidence are resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005). A federal habeas court "must defer to the factual findings in the state court proceedings," and "respect the ability of the fact-finder to evaluate the credibility of the witnesses." *Knox v. Butler*, 884 F.2d 849, 851 (5th Cir. 1989).

The state court's denial of this claim was not clearly contrary to or an unreasonable application of *Jackson*. Numerous witnesses testified with regard to the events at issue, including petitioner Gonzalez. The only evidence of self-defense was offered by petitioner Gonzalez and his claim of self-defense was contradicted by the other witnesses and the physical evidence, including the forensic testimony. Because all credibility choices must be resolved in favor of the verdict, it was not unreasonable for the state court to determine the evidence was constitutionally sufficient to sustain the jury's rejection of a self-defense argument and return a guilty verdict.

### B. Ineffective assistance of counsel - failure to exclude evidence

Petitioner Gonzalez asserts that, "right before" the jury began deliberating, evidence of his aggressive tendencies was "snuck in" through the State's witness Trudy Ramos; he argues his counsel was ineffective for "opening the door" to this evidence. (ECF No. 1 at 7). Mr. Gonzalez raised this claim in his appeal, and the appellate court determined counsel's performance was not deficient because counsel did argue he had not opened the door to this evidence. *Gonzalez*, 2016 WL 3944830, at *10. The appellate court further concluded the admission of the evidence was not prejudicial given the weight of the evidence against petitioner Gonzalez and the prosecution's emphasis of other acts of aggression as indicative of his violent nature. *Id.*

The state court's denial of this claim was not clearly contrary to or an unreasonable application of federal law. Given the weight of the evidence against petitioner Gonzalez, the state court's conclusion that this error was not prejudicial was not an unreasonable application of the *Strickland* test. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (noting the weight of the evidence of guilt in finding alleged deficient performance of counsel not prejudicial); *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (same).

### C. Ineffective assistance of counsel - failure to object to improper argument

The petitioner asserts trial counsel failed to object when, during closing argument, the prosecutor offered unsworn testimony and injected her own personal opinion; made a statement that contradicted the court's charge and misstated the law; and implied it was improper to consider Mr. Gonzalez's claim of self-defense. (ECF No. 1 at 8).

Mr. Gonzalez raised this claim in his direct appeal, and relief was denied. The state appellate court concluded: "the prosecutor's [subject] remark was not an opinion about the testimony of any witness, including the veracity of Gonzalez's testimony. Nor was the prosecutor injecting unsworn

testimony into her arguments. Instead, the prosecutor attempted to refute Gonzalez's self-defense claim by urging the jury to consider all the evidence." *Gonzalez*, 2016 WL 3944830, at *11.

The appellate court further found:

> Gonzalez contends the following two statements contradicted the jury charge and misstated the law:
>
>> He was a felon in possession of a weapon. You can't be engaged in criminal activity and be presumed reasonable. . . .
>> The State's testimony, the State's evidence, was credible. The only evidence of self-defense or necessity came from him. And you can conclude that he was not telling you the truth.
>
> Although it is not error for the State to quote or paraphrase the jury charge, jury argument that misstates the law or is contrary to the court's charge is improper. *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990). As to the statement that Gonzalez was "a felon in possession of a weapon [and you] can't be engaged in criminal activity and be presumed reasonable," the jury charge instructed the jury that a defendant's belief that deadly force was immediately necessary "is presumed to be reasonable if the defendant," among other things, "was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used."
>
> The complained-of statement was immediately preceded by the following argument:
>
>> You have to ask yourself, did he reasonably, reasonably believe that deadly force was necessary to protect himself. And further along in the charge, the Court tells you he's only presumed to be reasonable if he didn't provoke the situation. Obviously, he did. And if he wasn't otherwise making a crime, creating a crime. He was a felon in possession of a weapon. You can't be engaged in criminal activity and be presumed reasonable. So, that part of the charge is extremely important, because let's face it, this all comes down to what was going on in his mind. Right?
>
> We conclude the prosecutor's statement that Gonzalez was a felon in possession of a weapon and that a defendant cannot be engaged in criminal activity and be presumed reasonable was consistent with the law and merely paraphrased the jury instruction.

*Id.* at *11-12.

The state court determined the challenged remarks were not improper as a matter of state law and, accordingly, that counsel was not ineffective for failing to raise a non-meritorious claim. The

state court's determination that the remarks were not improper pursuant to state law is entitled to deference from this court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)*; Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013); *Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011). And counsel's performance cannot be found deficient or prejudicial if counsel does not raise a meritorious objection. *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997). Accordingly, the state court's denial of this claim was not contrary to or an unreasonable application of *Strickland*.

### D. Ineffective assistance of counsel - failure to introduce evidence of self-defense

Petitioner Gonzalez alleges that counsel was deficient for failing to introduce evidence of the victim's propensity for violence. (ECF No. 1 at 10). The petitioner raised this claim in his appeal, and the appellate court denied the claim:

> Outside the jury's presence and before the defense began its case-in-chief, defense counsel raised the argument that Ahn had a propensity for violence and the evidence would show Ahn had been convicted on one family assault violence charge, a second family violence charge, and a protective order issued against him. The trial court stated that unless self-defense was raised, the prior bad acts of the victim could not come in. During the defense's case-in-chief, Gonzalez's trial attorney raised self-defense, but did not seek to introduce the bad-act evidence. On appeal, Gonzalez asserts trial counsel was ineffective because the trial court's statement implied a willingness to allow the bad-act evidence to be admitted once self-defense was raised.
>
> The record is silent as to trial counsel's reason for not raising Ahn's prior bad acts. During the discussion with the trial court, the court noted none of the acts involved Rachel and that she may not have been aware of Ahn's actions when she stated Ahn was not violent towards her, except for the one time he kicked her. Defense counsel may have decided—as a matter of strategy—to not raise the prior bad acts. Because Gonzalez's complaint is not firmly founded in the record, he has not overcome the strong presumption that counsel's actions were reasonable trial strategy.

*Gonzalez*, 2016 WL 3944830, at *12.

When considering a state court's application of *Strickland*, the Court's review must be "doubly deferential," to afford "both the state court and the defense attorney the benefit of the

doubt." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 688-89. Counsel's choice of a defense and his strategy in arguing that defense to a jury are "virtually unchallengeable." *Id.* at 690. "[C]ounsel has wide latitude in deciding how best to represent a client . . ." *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

Petitioner Gonzalez has not shown that the alleged error was not a reasonable strategic decision. Because counsel's strategy is presumed reasonable absent a showing to the contrary, the state court's resolution of these claims was not clearly contrary to or an unreasonable application of *Strickland*.

## V. Certificate of Appealability

The Court next determines whether to issue a certificate of appealability (COA). *See* Rule 11(a) of the Rules Governing § 2254 Proceedings; *Miller–El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)). A COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). If a district court rejects a petitioner's constitutional claims on the merits, the petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This requires a petitioner to show "that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller–El*, 537 U.S. at 336 (citing *Slack*, 529 U.S. at 484).

A district court may deny a COA sua sponte without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For the reasons set forth above, the Court concludes reasonable jurists would not debate the conclusion that petitioner Gonzalez is not entitled to federal habeas relief. As such, a COA will not issue.

## VI. Conclusion and Order

The petitioner has failed to establish the state court's rejection of the aforementioned claims on the merits during his state habeas corpus proceedings was either contrary to, or involved an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings. As a result, Jose Gonzalez's federal habeas corpus petition does not warrant federal habeas corpus relief.

Accordingly, based on the foregoing reasons,

**IT IS HEREBY ORDERED** that:

1. Federal habeas corpus relief is **DENIED** and petitioner Jose Gonzalez's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 petition (ECF No. 1) is **DISMISSED WITH PREJUDICE**;

2. No Certificate of Appealability shall issue in this case; and

3. Motions pending, if any, are **DENIED**, and this case is now **CLOSED**.

It is so ORDERED.

SIGNED this 5th day of April, 2018.

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE